UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN HOWELL, #240303,

               Plaintiff,                      Hon. Janet T. Neff

v.                                      Case No. 1:21-cv-69

UNKNOWN MAYHEW, et al.,

               Defendants.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Defendants' Motion for Summary Judgment. (ECF No. 19).   Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendants' motion be granted and this matter terminated.

## BACKGROUND

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Oaks Correctional Facility (ECF) where the events giving rise to this action occurred.   Plaintiff has sued the following ECF officials: Correctional Officers Unknown Mayhew, Unknown Wert; Unknown Shiemburger, Unknown Bostwick, and Unknown Baum; Sergeant Unknown Mackey; and Nurse K. Goble.

The allegations of Plaintiff's complaint are rambling, going back and forth in time over the course of the complaint.   In addition, many of the allegations lack specificity. The complaint also contains many misspelled words, while other essential words are

missing from sentences.   As a result, the complaint is somewhat difficult to decipher, and the Court will summarize the allegations to the best of its ability.

It appears that Plaintiff arrived at ECF in August 2018.   Sometime after he arrived, he met Defendant Goble, who had known him 16 years earlier and knew his ex-girlfriend.   Goble approached Plaintiff during med line and told him that, unless he did what she wanted, she would "f*ck my life over . . . ."   (Compl., ECF No. 1, PageID.5.) Defendant Goble then looked Plaintiff up on the MDOC's Offender Tracking Information System (OTIS).   In February 2019, Goble started rumors, falsely telling "everyone" that Plaintiff was a rapist and alleging that Plaintiff had raped her.   (*Id.* at 5–7.)   Plaintiff denies being a rapist.[1]   Plaintiff filed a grievance against Defendant Goble.

Plaintiff alleges that he placed a grievance in the mailbox on October 29, 2020. (*Id.*, PageID.10). Defendants Wert and Mayhew "started abusive actions over my filings as threat[en]ing me."   (*Id.*, PageID.7.)   Plaintiff states that he began to experience harassment as a result of "these rumors" and that the rumors have resulted in "fighting and [Wert and Mayhew] talk[ing] smack" against him for more than one year.   (*Id.*, PageID.6, 8.)   Plaintiff alleges that ECF officials:

---

[1] Plaintiff presently is incarcerated on a conviction for assault with intent to commit sexual penetration, in violation of Mich. Comp. Laws § 750.520g(1).   In addition, Plaintiff has been discharged from a sentence imposed in 2005 for accosting a child for immoral purposes, Mich. Comp. Laws § 740.145a.   Plaintiff pleaded guilty to both charges.   *See*   MDOC   Offender   Tracking   &   Info.   Sys., https://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=240303   (visited May 18, 2021).

run like a gang.   When inmate[]s file grievances, they call us snitch[e]s.
They start get other staff who get up start same attack[]s upon us.   They
even pay inmate[]s to jump us inmate[]s.

. . .

Correctional Officer Bostwick and Correctional Officer Mayhew are top
leading of the gang.   As Sgt. Ward place[]s attack in orders in order[]s of
harm inmate[]s to.

(*Id.*, PageID.6–7.)   Plaintiff also contends that Defendant Mayhew became angry

about the grievance and took his property that same date, and Defendant Baum refused

to return it to Plaintiff.   Plaintiff's property was not returned to him until January 10,

2021, when Correctional Officer Tayler (not a defendant) delivered it.   Officer Taylor

told Plaintiff that the property had been in the back room for months, having been placed

there by Defendants Wert and Mayhew.   (*Id.*, PageID.13, 17.)

In October 2020, likely on October 31, inmate "Mark" told Plaintiff that Plaintiff

had to get off the unit and that Mark had to handle undescribed "business" for Defendant

Mayhew.   Suddenly, Mark pulled a "Shawen"[2] out of his waistband.   (*Id.*, PageID.8.)

In fear, Plaintiff punched Mark and beat him up.   (*Id.*)   Plaintiff was removed by

guards and placed in a cage in the interview room for the weekend of October 31 through

November 2, 2020.   Defendants Wert and Mayhew came into the interview room.

Plaintiff told them to leave him alone.   They responded that Plaintiff would die in the

unit and suggested that he kill himself.   They also stated that he had "hurt a good

---

[2] The Court assumes that Plaintiff intends to refer to a "shank," prison slang for a
stabbing implement.

woman," referring to Defendant Goble.   (*Id.*, PageID.9.)   Defendants Wert and Mayhew also allegedly began harassing Plaintiff because he refused to bring drugs into the facility and refused to write a note to his ex-girlfriend, as Goble demanded.   (*Id.*, PageID.9.)   After being in the cage for three days, Plaintiff was placed in a segregation cell with no working lights.   (*Id.*, PageID.14.)

Plaintiff alleges that he spoke with his mental health worker on October 30, 2020. On November 2, he asked to speak with the provider again.   Defendant Bostwick allegedly told Plaintiff that he was "being taken out back as a dead nig*er that week." (*Id.*)   Bostwick also told Plaintiff that he did not deserve to breathe the same air as Bostwick.   (*Id.*, PageID.9.)   Bostwick also refused Plaintiff food on one occasion, indicating that he had not yet had a bowel movement, and feces were all Plaintiff was getting to eat that week.   (*Id.*, PageID.9, 14.)   In addition, Defendant Bostwick suggested loudly that the officers should take Plaintiff's photograph and use it as a target at the shooting range.   (*Id.*, PageID.14.)   That same date, while Plaintiff was seeing the doctor, Defendant Mayhew trashed his cell during a room search.   Plaintiff asked Defendant Mayhew to stop harassing him, and Mayhew responded, "[Y]our victim[]s don't forget."   (*Id.*, PageID.15.)

Plaintiff also alleges that, while Defendant Wert is on rounds, he says "little threaten[ing] things" and calls Plaintiff names.   (*Id.*, PageID.9, 14.)   Plaintiff and witnesses wrote to Ms. Holden (not a defendant), who indicated that she would speak with Defendant Bostwick. (*Id.*, PageID.9.)

On November 2, 2020, Defendants Mayhew, Mackey, and Baum allegedly beat Plaintiff.  (*Id.*, PageID.11.)   Elsewhere, Plaintiff alleges that Defendants Mayhew and Baum and non-Defendant Farley entered his cell and beat him with closed fists.   In addition, Defendant Mackey kicked Plaintiff and Defendant Baum pepper-sprayed him. (*Id.*, PageID.17.)   Plaintiff also alleges that his head was beaten against the wall while he was in the segregation shower.   Defendant Baum and an unidentified correctional officer purportedly bragged about the beating, stating that the "only way o[u]t of this prison is dead."  (*Id.*, PageID.11.)

Plaintiff asserts that Defendant Mayhew has a close relationship with Defendant Goble. [3]   And  Correctional  Officer  Mitchell  (not  a  defendant)  told  Plaintiff  that Defendants did not like him and that he should watch his back.   (*Id.*)   Defendants Mackey and Mayhew told Plaintiff that he was going to be killed.   Plaintiff alleges that they beat him up because Defendant Goble put out a hit on him and because they wanted to steal his property.   (*Id.*)

After returning to his unit ten or fifteen days after his fight with prisoner Mark, Plaintiff was placed on toplock, or room restriction.   (*Id.*, PageID.9, 11.)   Defendants Bostwick and Mayhew allegedly began again to "mess" with Plaintiff.   (*Id.*, PageID.8.)

---

[3] According to one of Plaintiff's attached witness statements, Defendant Mayhew offered the witness $5,000.00 to rape and stab Plaintiff.   The affidavit also indicates that Defendant Goble was fired from ECF and that Defendant Mayhew told the witness that Goble was in contact with the other Defendants and ordered the hit on Plaintiff.   (Ex. A to Compl., ECF No. 1-1, PageID.26.)

Plaintiff alleges that Defendants' actions, including daily room searches for some period, have been committed in "retaliation." (*Id.*) He also alleges that Defendant Bostwick routinely kicked Plaintiff's door during second shift, that unspecified officers threatened him, and that the problems have caused him to see his mental health provider often. Plaintiff complained to Assistant Resident Unit Supervisor (ARUS) Johnson (not a defendant), who told Plaintiff not to complain to her about Defendant Goble, as Goble was a dear friend of hers. (*Id.*) Defendant Shiemburger allegedly spit in Plaintiff's face once and refused to give Plaintiff his food trays on unspecified occasions. (*Id.*, PageID.13.)

At some point, Plaintiff covered his cell-door window, a practice that Plaintiff alleges is common when inmates are using the toilet. Defendants Mackey and Mayhew came into Plaintiff's cell. Plaintiff was crying because of the harassment. Mackey told Plaintiff not to cover his window. When Plaintiff asked for his property, Mayhew refused it, and Mackey advised Plaintiff not to cover his window. Plaintiff asked to see the shift commander, but that, too, was denied. Defendant Mackey told Plaintiff, "[L]isten I'll beat your ass, you better shut your mouth, [and] follow his orders." (*Id.*, PageID.16.). After the officers left, Defendant Mayhew came back and told Plaintiff to be ready, because officers planned to "beat[] your f*cking head in after count[;] be ready." (*Id.*) Plaintiff told Defendants that what they were doing was wrong and that property must be returned in 24 hours under prison policy. On January 10, 2021, Officer Taylor (not a defendant) returned Plaintiff's property to him, he had found it in a closet in the

back room, where it had been for months after being placed there by Defendants Wert and Mayhew.   (*Id.*, PageID.13, 17.)

Plaintiff alleges that Defendants are trying to kill him based on rumors that he is a rapist and a "child-offender," which he denies.   (*Id.*, PageID.10.)   Plaintiff states that, after returning to the unit, he did not receive his property for months, contrary to policy and practice.   He complains that Defendants give cell phones, drugs, and other items to prisoners who help them, and that there is a gang at the facility.   (*Id.*)   Plaintiff also alleges that Defendants continue to call him a "rat," and he is likely to be attacked again. (*Id.*, PageID.18.)   Defendant Bostwick allegedly suggested loudly that Defendants go to the practice range on the weekend and use Plaintiff's photo as a target.   (*Id.*, PageID.14.)   Further, Defendant Shiemburger allegedly spit in Plaintiff's face and denied him meals on unspecified occasions.   (*Id.*, PageID.13.)

In addition, Plaintiff complains that, because the prisoner grievance system lacks confidentiality, correctional officers know when inmates file grievances and remove or destroy the grievances before they reach the grievance coordinator.   Plaintiff asserts that, when prisoners raise the problem with the grievance coordinator, she tells them that she does not care and that it's not her problem.   (*Id.*, PageID.6–7.)

Plaintiff complains that Defendants' interference with the grievance process violated his rights under the First and Fourteenth Amendments.   Plaintiff alleges that Defendants Mayhew and Baum took his property and refused to return it for months, in violation of his rights under the Due Process Clause of the Fourteenth Amendment.   He

also complains that Defendant's harassing, threatening, assaultive, and retaliatory conduct violated the First and Eighth Amendments and prison policy.   Plaintiff further contends that Defendant Goble violated her duty and committed Eighth Amendment violations by ordering the assault.   In addition, Plaintiff asserts that Defendants removed grievance forms from his cell, ostensibly in violation of the Due Process Clause of the Fourteenth Amendment.   He further contends that the facility violated the Eighth and Tenth Amendments by failing to adequately investigate Defendants' criminal conduct.   He also alleges that Defendants have slandered him, in violation of the First Amendment.

Most of Plaintiff's claims were dismissed on screening.   (ECF No. 6-7).   At this juncture, the only claims remaining are Eighth Amendment claims against Defendants Mayhew, Wert, Goble, Mackey, Bostwick, and Baum.   Specifically, Plaintiff's remaining claims fall into four categories: (1) Defendants Mayhew and Wert attempted to hire another prisoner to stab Plaintiff; (2) Defendants Mayhew, Mackey, and Baum "beat and kicked" Plaintiff without justification; (3) Defendant Goble "ordered or encouraged" Defendants Mayhew, Mackey, and Baum to beat and kick Plaintiff; and (4) Defendants Mayhew, Wert, Mackey, and Bostwick "threatened to kill" Plaintiff.   (ECF No. 6 at PageID.98-101).   Defendants Mayhew, Wert, Goble, Mackey, Bostwick, and Baum move for summary judgment on the ground that Plaintiff has failed to properly exhaust his administrative remedies.   Plaintiff has responded to Defendants' motion.

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   Whether a fact is "material" depends on "whether its resolution might affect the outcome of the case."   *Harden v. Hillman*, 993 F.3d 465, 474 (6th Cir. 2021).

A party moving for summary judgment can satisfy its burden by demonstrating that the non-moving party, "having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case."   *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005).   Once the moving party makes this showing, the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial."   *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006).   The existence of a mere "scintilla of evidence" in support of the non-moving party's position, however, is insufficient.   *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005).

While the Court must view the evidence in the light most favorable to the non-moving party, that party "must do more than simply show that there is some metaphysical doubt as to the material facts."   *Amini*, 440 F.3d at 357.   The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial."   *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006).   Likewise, the non-moving party cannot

merely "recite the incantation, 'credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353-54 (6th Cir. 2004).

Accordingly, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735. Stated differently, the "ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Harden*, 2021 WL 1257802 at *4.

While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, a moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). Where the moving party has the burden, "his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). Accordingly, summary judgment in favor of the party with the burden of proof "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## ANALYSIS

Pursuant to 42 U.S.C. § 1997e(a), a prisoner asserting an action regarding prison conditions under 42 U.S.C. § 1983 must first exhaust his administrative remedies.   *See Porter v. Nussle*, 534 U.S. 516, 524 (2002).   This obligation only extends, however, to such administrative remedies as are available.   *Ross v. Blake*, 578 U.S. 632, 642 (2016) (a prisoner "must exhaust available remedies, but need not exhaust unavailable ones").

Prisoners are no longer required to demonstrate exhaustion in their complaints. *See Jones v. Bock*, 549 U.S. 199, 216 (2007).   Instead, failure to exhaust administrative remedies is "an affirmative defense under the PLRA" which the defendant bears the burden of establishing.   *Ibid.*

With respect to what constitutes proper exhaustion, the Supreme Court has stated that "the PLRA exhaustion requirement requires proper exhaustion" defined as "compliance with an agency's deadlines and other critical procedural rules."   *Woodford v. Ngo*, 548 U.S. 81, 90-93 (2006).   In *Bock*, the Court reiterated that

> Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'   The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

*Bock*, 549 U.S. at 218.

MDOC Policy Directive 03.02.130 articulates the applicable grievance procedures for prisoners in MDOC custody.   The now current version of this Policy, which took effect on March 18, 2019, superseded the prior version which had been in effect since

July 9, 2007.   (MDOC Policy Directive 03.02.130 (Mar. 18, 2019)).   The events relevant to the present motion are governed by the previous version of this Policy.

Prior to submitting a grievance, a prisoner must attempt to resolve the issue with staff, unless prevented by circumstances beyond his control or the issue falls within the jurisdiction of Internal Affairs.   MDOC Policy Directive 03.02.130 ¶ P (July 9, 2007). The prisoner must attempt to resolve the matter with staff within two days of becoming aware that there exists a grievable issue.   (*Id.*).

If this attempt is unsuccessful (or such is inapplicable), the prisoner may submit a Step I grievance, but such must be submitted within five business days after attempting to resolve the matter with staff.   MDOC Policy Directive 03.02.130 ¶ V (July 9, 2007).   The issues asserted in a grievance "should be stated briefly but concisely" and the "[d]ates, times, places, and names of all those involved in the issue being grieved are to be included."   MDOC Policy Directive 03.02.130 ¶ R (July 9, 2007).

If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II within ten business days of the response, or if no response was received, within ten business days after the response was due.   MDOC Policy Directive 03.02.130 ¶ BB (July 9, 2007).   If the prisoner is dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal the matter to Step III.   MDOC Policy Directive 03.02.130 ¶ FF (July 9, 2007).

According to Plaintiff's complaint, the events giving rise to his remaining claims occurred in October and November 2020.   In support of their motion, Defendants have submitted evidence that Plaintiff failed to pursue through Step III any grievance regarding events occurring during this time period.   Specifically, Defendants have submitted evidence demonstrating that Plaintiff pursued through Step III only one grievance after September 4, 2019.   (ECF No. 20 at PageID.167-73).   Obviously, none of the grievances Plaintiff filed prior to September 4, 2019, can exhaust claims concerning events from October and November 2020.

As for the one grievance Plaintiff filed after September 2019, such cannot exhaust any of Plaintiff's remaining claims because it was not filed until *after* Plaintiff initiated the present action.   *See, e.g., Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999) ("we must dismiss plaintiff's complaint because he filed his federal complaint before allowing the administrative process to be completed"); *Hopkins v. Ohio Department of Corrections*, 84 Fed. Appx. 526, 527 (6th Cir., Dec. 4, 2003) ("[w]hen a prisoner fails to exhaust his administrative remedies before filing a civil rights complaint in federal court, or only partially exhausts administrative remedies, dismissal of the complaint is appropriate" because "[e]xhaustion may not be completed after a federal complaint has been filed"); *Johnson v. Burt*, 2021 WL 3473483 at *1 (W.D. Mich., Aug. 6, 2021) (same).

In response, Plaintiff states that "since June 3, 2019," he "sought remedies threw (sic) the prisoner grievance procedure," but that "the correctional officers continued to discard [his] grievances."   Plaintiff fails, however, to identify any specific instances in

-13-

which a grievance was discarded or his attempts to file a grievance were otherwise thwarted or impeded.   Moreover, Plaintiff's statements are neither sworn nor contained in an affidavit or similar document.   Such vague unsworn statements fail to create a genuine factual dispute regarding Plaintiff's efforts to properly exhaust his claims. Plaintiff has also submitted copies of a grievance he filed in 2019.   As discussed above, however, this grievance predates the conduct giving rise to Plaintiff's remaining claims. Finally, Plaintiff's vague unsworn statements regarding alleged attempts to intimidate him for filing grievances is insufficient.   *See, Sango v. Brandt*, 2019 WL 8399788 at *2 (W.D. Mich., Dec. 6, 2019) (vague or generalized fear of intimidation insufficient to excuse a failure to exhaust administrative remedies).

In sum, Defendants have satisfied their burden to demonstrate that Plaintiff failed to properly exhaust any of his remaining claims.   Accordingly, the undersigned recommends that Defendants' motion for summary judgment be granted.

## **CONCLUSION**

For the reasons articulated herein, the undersigned recommends that Defendants' Motion for Summary Judgment (ECF No. 19) be granted; Plaintiff's remaining claims against Defendants Mayhew, Wert, Goble, Mackey, Bostwick, and Baum be dismissed without prejudice for failure to exhaust administrative remedies; and this matter terminated.   For the same reasons the undersigned makes these recommendations, the undersigned finds that an appeal of such would be frivolous.   *Coppedge v. United States*,

-14-

369 U.S. 438, 445 (1962).  Accordingly, the undersigned further recommends that an appeal of this matter by Plaintiff would not be in good faith.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of the date of service of this notice.   28 U.S.C. § 636(b)(1)(C).   Failure to file objections within the specified time waives the right to appeal the District Court's order.   *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,

Date: April 27, 2022            /s/ Phillip J. Green
                               PHILLIP J. GREEN
                               United States Magistrate Judge

-15-